## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| JANE DOE, JANE DOE II individually and on behalf of all others similarly situated, | Case No.: |
| Plaintiffs, | |
| v. | **CLASS ACTION COMPLAINT** |
| | **JURY TRIAL DEMANDED** |
| SHADY GROVE REPRODUCTIVE SCIENCE CENTER, P.C., | |
| Defendant. | |

Plaintiffs Jane Doe and Jane Doe II ("Plaintiffs"), individually and on behalf of all others similarly situated, assert the following against Defendant Shady Grove Reproductive Science Center, P.C. ("Shady Grove Fertility" or "SGF") based upon personal knowledge, where applicable, information and belief, and the investigation of counsel.

### SUMMARY OF ALLEGATIONS

1.      SGF is a physician practice group specializing in fertility services, including fertility testing, Intrauterine Insemination (IUI), In Vitro Fertilization (IVF), preimplantation genetic testing, and egg freezing.  SGF has approximately 50 facilities in 10 states and Washington, D.C., and represents that it has facilitated more than 100,000 child births.

2.      In connection with providing medical services, SGF operates the website www.shadygrovefertility.com (the "SGF Website"), which includes webpages with the functionality to "Find a Doctor", "Find a Location", "Schedule Appointment", and "Contact [SGF]." Each of these features are described below:

3.      **Schedule Appointment.**  New patients can schedule an appointment on the SGF Website through the page https://www.shadygrovefertility.com/appointment/.  In order to do so, new patients must complete an online form and provide personally identifiable information ("PII") including their first and last name, city, state, date of birth, email address, and phone number.

Patients are also prompted to input their preferred treatment state, preferred practice location, insurance information, and how they learned of SGF.  Once the new patient intake form is completed, the new patient receives confirmation that a "liaison from [its] New Patient Center" will respond "as soon as possible."

4.      **Contact SGF.**  Separately, individuals can contact SGF directly through its "Contact Us" page available at https://www.shadygrovefertility.com/contact-us/.  On this page, they are prompted to provide their PII, including their first and last name, city, state, date of birth, email address, and phone number.  SGF also requests they provide the specific service they are inquiring about (with five options presented: Low Tech Treatment Solutions (IUI), In Vitro Fertilization (IVF), Donor Egg Program, Becoming an Egg Donor, and Egg Freezing), how they learned about SGF, whether they are a "current Patient to SGF[]," "Past patient to SGF[]," or "not currently a patient with SGF[]", and to type out any "[a]dditional questions" they may have.  Once the form is completed, the individual receives a message that a "liaison from [its] New Patient Center" will respond "within 24 hours."

5.      **Find a Doctor.** Using the "Find a Doctor" page available at https://www.shadygrovefertility.com/our-care-team/doctors/, new and existing patients can search for their "fertility physician" (or a new one) by location or name.  Once on the page of a specific fertility health care provider, individuals can see the provider's information and click a "Schedule Appointment" button to make an appointment.

6.      **Find a Location.**  Individuals can separately use the "Find a Location" page (available at https://www.shadygrovefertility.com/locations/) to search for a fertility clinic by zip code, city/state, or state.  Once a location is selected, individuals can view more information about the specific location and select the button to "Schedule Appointment."

7.      Plaintiffs and Class members are SGF patients who used the SGF Website, including at least one of the pages described above to communicate with SGF (hereinafter "SGF Webpages").

8.      Plaintiffs and Class members reasonably expected that their communications with

SGF through the SGF Webpages would remain private.

9.      Indeed, SGF confirms and reinforces the reasonableness of this expectation in their Notice of Privacy Practices.  In this policy, SGF defines "Protected Health Information" and "PHI" to mean all "information, including demographic information, that may identify you and that relates to your past, present or future physical or mental health or condition and related health care services."  Absent limited circumstances described in that policy (none of which apply here), SGF promises it will "[m]aintain the confidentiality of [Plaintiffs' and Class members'] protected health information" and will "not use or disclose your PHI for purposes not described in this Notice unless you give us written authorization to do so (including via electronic signature)."  Plaintiffs and Class members' communications with SGF through the SGF Website to make an appointment, contact SGF, find a doctor, and find a location, are private and should not have been used or disclosed without their written authorization because they are communications that reveal information that identifies Plaintiffs and Class members, as well as their health information, such as patient status.

10.     Even if these communications were not PHI as defined by SGF, they are nonetheless private and should not be disclosed.  Plaintiffs' and Class members' communications on the SGF Webpages contain identifying information, as well as the content of the communications themselves, i.e., that they made an appointment for fertility services (Schedule Appointment page), sought out doctors for fertility services (Find a Doctor page), sought out specific locations for fertility services (Find a Location page), or otherwise contacted a fertility treatment provider (Contact SGF page).

11.     Unbeknownst to Plaintiffs and Class members, and despite these clear representations, SGF knowingly and intentionally disclosed their private communications on the SGF webpages to third parties, including to Google LLC ("Google"), Meta Platforms, Inc. ("Meta"), and Microsoft Corp. ("Microsoft").  SGF did so by incorporating third party analytics and advertising tracking software on the SGF Webpages, which immediately cause the communications on those webpages to be transmitted to those third parties.  These

3

communications were not aggregated or deidentified, nor were third parties, like Google, Meta, and Microsoft, prohibited in any way from using these communications for their own benefit.

12.     SGF's disclosure of this information without consent constitutes an extreme invasion of Plaintiffs' and Class members' privacy.  Given the secret and undisclosed nature of SGF's conduct, additional evidence supporting Plaintiffs' claims, including the full extent of medical information SGF disclosed and how third parties used that information, will be revealed in discovery.

**PARTIES**

**A.     Plaintiffs**

13.     **Plaintiff Jane Doe** is a resident of Chester County, Pennsylvania.

14.     Plaintiff Jane Doe has been a patient at SGF since approximately May of 2019.  As a patient of SGF, Plaintiff Jane Doe has paid money to SGF in exchange for medical services.

15.     In March 2024, Plaintiff Jane Doe used the SGF Webpages to search for and locate a fertility provider using the "Find a Doctor" page.  Plaintiff Jane Doe, separately, searched for a specific SGF location using the "Find a Location" page.

16.     After doing so, Plaintiff Jane Doe used the "Contact [SGF]" page to contact SGF. She filled out the information requested, including providing her first and last name, city, state, date of birth, email address, phone number, and patient status, as well as the specific medical service that she was interested in.

17.     Plaintiff Jane Doe used her Google Chrome browser when visiting the SGF Webpages and maintains several Google accounts. At the time Plaintiff Jane Doe used the SGF Webpages, she also had a Facebook and Instagram account.

18.     Unbeknownst to Plaintiff Jane Doe, while she was communicating with SGF on these SGF Webpages, SGF disclosed her private communications to third parties, including, at least, Google, Meta, and Microsoft.

4

19.     Specifically, SGF disclosed to third parties: (1) the name of the fertility provider that she searched for using the "Find a Doctor" page; (2) the specific SGF location she intended to visit; and (3) that Plaintiff Jane Doe contacted her fertility provider, SGF, for fertility services.

20.     Plaintiff Jane Doe did not consent to the disclosure and interception of her communications on these SGF Webpages, which was never disclosed to her and directly contrary to the representations made by SGF.

21.     **Plaintiff Jane Doe II** is a resident of Harris County, Texas.

22.     Plaintiff Jane Doe II became a patient at SGF in approximately December of 2023. As a patient of SGF, Plaintiff Jane Doe II has paid money to SGF in exchange for medical services.

23.     Prior to her first visit, Plaintiff Jane Doe II used the SGF Webpages to search for and locate her fertility provider using the "Find a Doctor" page.  Plaintiff, separately, searched for a specific SGF location using the "Find a Location" page.

24.     After doing so, Plaintiff Jane Doe II used the "Schedule Appointment" page to schedule an appointment.  She filled out the information requested, including providing her first and last name, city, state, date of birth, email address, phone number, as well as the specific medical service (fertility treatment) and the doctor that she was interested in.

25.     Plaintiff Jane Doe II used her Google Chrome browser when visiting the SGF Website and maintains a Google account.  At the time Plaintiff Jane Doe II used the SGF Webpages, she also had a Facebook account.

26.     Unbeknownst to Plaintiff Jane Doe II, while she was communicating with SGF on these SGF Webpages, SGF disclosed her private communications to third parties, including, at least, Google, Meta, and Microsoft.

27.     Specifically, SGF disclosed to third parties: (1) the name of the fertility provider that she searched for using the "Find a Doctor" page; and (2) that she scheduled an appointment with the fertility provider for specific medical services, along with her PII.

28.     Plaintiff Jane Doe II did not consent to the disclosure and interception of her communications on these SGF Webpages, which was never disclosed to her and directly contrary to the representations made by SGF.

**B.     Defendant**

29.     **Defendant Shady Grove Reproductive Science Center, P.C.** is a Maryland corporation with its principal place of business at Suite 400, 9601 Blackwell Road, Rockville, Maryland 20850.

30.     SGF operates approximately 50 facilities throughout the nation, including in Pennsylvania, Maryland, California, Colorado, Delaware, Florida, Georgia, North Carolina, Texas, Virginia, and Washington, D.C.

31.     SGF knowingly and intentionally incorporated analytics and advertising tracking technology on the SGF Webpages for the purposes of disclosing SGF patients' private communications to third parties, including Google, Meta, and Microsoft.

32.     As the owner and operator of the SGF Webpages, SGF had complete control over the technology it incorporated, and whether it used third parties' analytics and advertising tracking technology.

33.     SGF knew at the time it incorporated this analytics and advertising tracking technology on the SGF Webpages that it would result in the disclosure of patients' private communications to third parties by virtue of the technology's purpose, how it functions, and the analytics SGF received as a result.

34.      For instance, Google provides website owners that use its tracking technology (like SGF) with access to the data collected from their users and provides them with tools and analytics to leverage that information to reach these individuals through Google Ads.  Meta and Microsoft provide similar tools and analytics that allow website owners that use their respective tracking technology to access the data collected from their users and leverage it for advertising purposes.

35.    Even without this, SGF must have known this technology would cause the disclosure of patients' private communications, given repeated warnings by the Federal Trade Commission (FTC), Office for Civil Rights (OCR), and other federal agencies and regulatory bodies against incorporating this type of technology on healthcare websites.

36.    These entities have, since at least December 2022, warned healthcare providers like SGF that the incorporation of tracking technologies on healthcare websites will likely violate HIPAA and the FTC Act.[1]

37.    The FTC and OCR provided additional "notice" to healthcare providers in July of 2023 about the risk of using this technology, including specifically Google Analytics and the Meta/Facebook Pixel, because they can result in the "unauthorized disclosure of an individual's personal health information to third parties" including "frequency of visits to health care professionals" and "where an individual seeks medical treatment."[2]

38.    Thus, despite being on notice, SGF continued to disclose its patients' private communications through its incorporation of these types of tracking technologies on the SGF Webpages.  As such, SGF's conduct was intentional despite knowing the privacy violations it caused to Plaintiffs and Class members.

## JURISDICTION AND VENUE

39.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C §1332(d), because the amount in controversy for the Class exceeds $5,000,000 exclusive of interest and costs, there are more than 100 putative members of the Classes defined below, and a significant portion of putative Class members are citizens of a state different from the Defendant.

40.    This Court also has subject matter jurisdiction over this action pursuant to 28

---

[1] Steve Adler, *One-third of Healthcare Websites Still Use Meta Pixel Tracking Code,* HIPPA JOURNAL (Apr. 5, 2024), https://www.hipaajournal.com/one-third-healthcare-websites-meta-pixel-tracking-code-2024/#:~:text=A%20study%20conducted%20in%202021,by%20The%20Markup%2FSTAT%20revealed.

[2] Press Release, FED. TRADE COMM'N, FTC and HHS Warn Hospital Systems and Telehealth Providers about Privacy and Security Risks from Online Tracking Technologies (Jul. 20, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-hhs-warn-hospital-systems-telehealth-providers-about-privacy-security-risks-online-tracking.

U.S.C. §1332(a) because the amount in controversy in this case exceeds $75,000 and this action is between citizens of different states.  Plaintiffs are residents of Pennsylvania and Texas, whereas Defendant is a Maryland corporation with its principal place of business in Maryland.[3]

41.     This Court has general jurisdiction over SGF because it is a Maryland corporation with its principal place of business in this State.  SGF is also subject to specific personal jurisdiction in this State because a substantial part of the events and conduct giving rise to Plaintiffs' claims occurred in this State, including SGF's incorporation of third-party tracking technology on the SGF Webpages and its disclosure of Plaintiffs' private communications with SGF from the SGF Webpages to third parties.

42.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b), (c), and (d) because a substantial portion of the conduct described in this Class Action Complaint was carried out in this District.

## FACTUAL BACKGROUND

### A.     The Shady Grove Fertility Website

43.     Shady Grove Fertility was co-founded by Michael J.  Levy, M.D. and Arthur W. Sagoskin, M.D.[4] in 1991[5] to "provide cutting-edge fertility care in an environment that supported patients' physical, emotional, and financial needs."[6]

44.     The practice began with three physicians in one Maryland office.  By 2014, SGF's embryology labs in Rockville, MD, Towson, MD, and Chesterbrook, PA, performed nearly 10,000 Assisted Reproductive Technology cycles ("ART"), approximately 5% ART cycles in the United States.  By 2021, SGF employed 70 physicians and had expanded to 41 offices nationwide, one

---

[3]     Shady Grove Fertility, LINKEDIN, https://www.linkedin.com/company/shady-grove-fertility-center  (last visited Aug. 9, 2024).

[4]     *About Shady Grove Fertility,* SHADY GROVE FERTILITY, https://www.shadygrovefertility.com/about-sgf/ (last visited Aug. 9, 2024).

[5]     Shady Grove Fertility Center Overview, PITCHBOOK, https://pitchbook.com/profiles/company/89958-52#overview (last visited Aug. 9, 2024).

[6]     *About Shady Grove Fertility*, *supra* note 4.

office in Santiago, Chile, 11 embryology labs, and international partner clinics throughout the UK and Canada.[7]  By 2014, SGF had helped create more than 40,000 babies,[8] and by 2021 more than 100,000 babies.[9]  Today, SGF has approximately 50 facilities in 10 states and Washington, D.C. The SGF Website receives approximately 93,600 monthly visitors.

45.     SGF's ART services include egg freezing, timed intercourse assistance, ovulation induction, IUI, IVF, frozen embryo transfers, access to donor sperm, donor eggs, donor embryos, gestational carriers, preimplantation genetic testing, and male fertility support and vasectomies.[10]

46.     In connection with providing fertility treatment, SGF makes available the SGF Webpages, which patients can use to locate current or future fertility providers, locate a specific SGF facility, contact SGF, and make appointments.

**B.     SGF's Promises to Users & Sharing of Data**

47.     SGF pledges to users that it "is committed to protecting [users'] privacy"[11] and it will "[m]aintain the confidentiality of your protected health information ("PHI"),"[12] i.e., "information, including demographic information, that may identify [the user] and that relates to [the user's] past, present or future physical or mental health or condition and related health care services."  SGF expressly states that it "will not use or disclose [the user's] PHI" "unless [the user] gives [SGF] written authorization to do so" except for limited purposes not applicable herein.

48.     Given these representations and the types of services SGF provides, users like

---

[7]      *Moments Made Possible: 30 Years of SGF and 100,000 Babies Born*, SHADY GROVE FERTILITY, https://www.shadygrovefertility.com/article/moments-made-possible-30-years-100000-babies-born/ (last visited Aug. 9, 2024).

[8]      Caroline Cunningham, *Shady Grove Fertility Started as a Tiny Maryland Clinic.  Now It's the Country's Biggest Babymaker*, WASHINGTONIA (May 1, 2017), https://www.washingtonian.com/2017/05/01/shady-grove-fertility-started-tiny-maryland-clinic-now-countrys-biggest-babymaker/.

[9]      *Moments Made Possible: 30 Years of SGF and 100,000 Babies Born, supra*. note 7.

[10]     *Fertility treatment*, SHADY GROVE FERTILITY, https://www.shadygrovefertility.com/treatments (last visited Aug. 9, 2024).

[11]     *Privacy Policy*, SHADY GROVE FERTILITY, https://www.shadygrovefertility.com/privacy/privacy-policy (last visited Aug. 9, 2024).

[12]     *Notice of Privacy Practices*, SHADY GROVE FERTILITY, https://www.shadygrovefertility.com/privacy/notice-privacy-practices (last visited Aug. 9, 2024).

Plaintiffs and Class members expected their identifiable information and private communications with SGF through the SGF Webpages, including PHI, would remain confidential.

49.     Despite these promises, SGF incorporated tracking technology on the SGF Webpages and disclosed Plaintiffs' and Class members' private communications, including PHI, to third parties.  This information was shared with at least Google, Meta, and Microsoft.

**C.     SGF's Incorporation of Tracking Technology on the SGF Website**

50.     SGF incorporated tracking technology on the SGF Webpages, including at least Google's, Meta's, and Microsoft's analytics and advertising tracking technology as well as that of other third parties. Through this tracking technology, SGF disclosed Plaintiffs' and Class members' private communications, as well as identifiable information, including unique user and device identifiers and IP Addresses to third parties, including Google, Meta, and Microsoft, who are some of the largest advertising companies in the world.

51.     SGF incorporated third party analytics and advertising tracking technology, including Google Analytics and Google Ads, the Meta/Facebook Pixel, and Microsoft's UET Tag on the SGF Webpages by adding a small piece of JavaScript measurement code to each page.  This code immediately intercepts a user's interaction with the webpage every time the user visits it, including what specific pages they visit and what they click on.  The code also collects identifiable information, such as the unique user and device identifiers (e.g., GUID, Client ID, c_user cookie) and IP address.

52.     Once the code collects the data, it packages the information and sends it to the third party, like Google, Meta, or Microsoft, for processing.  Once the data is processed, the third parties create reports that analyze the data.  For example, Google generates reports on acquisition (e.g., information about where your traffic originates, the methods by which users arrive at your site or app, and the marketing efforts you use to drive traffic), engagement (e.g., measure user engagement by the events and conversion events that users trigger and the web pages and app screens that user visits), and demographics (e.g., classify your users by age, location, language, and gender, along with interests they express through their online browsing and purchase

activities).    Meta and Microsoft offer similar reports through their respective services.    For example, Meta provides tools called Events Manager and Ads Manager that allow the website owner to view the activity on their websites with a breakdown of the metrics and create custom audiences based on the user data collected to target those users.    Microsoft offers a similar dashboard that provides the website owner with an overview of the actions users take on the website in order to optimize campaigns.

53.    In addition to using the data collected through their tracking technologies to provide marketing and analytics services, the third parties also use the data for their own purposes, such as improving their advertising capabilities and training machine learning models.    In the case of Google, it uses the data obtained through its tracking pixel for purposes such as improving its advertising network and creating wholesome profiles data points on individuals.    Like Google, Meta uses the data it obtains through its pixel to improve its machine learning systems and advertising models, and Microsoft likewise uses the data it obtains to improve its products and targeted advertising.

54.    SGF incorporated tracking technology on the SGF Webpages, including Google's, Meta's, and Microsoft's analytics and advertising tracking technology on the SGF Website.    As a result, SGF disclosed users' communications on the SGF Webpages to third parties, including Google, Meta, and Microsoft.    These third parties received, at least, identifiable information (e.g., unique user and device identifiers, like GUID, Client ID, c_user cookie, and IP Addresses) and private communications, including patient status, requests for appointments, the provider and/or location Plaintiffs and Class members sought for fertility services, and that Plaintiffs and Class members contacted SGF for fertility treatment.

55.    For example, as depicted in Figure 1, as a result of SGF's decision to incorporate Google Analytics on the appointment scheduling page, SGF disclosed to Google that the individual sought out an appointment with SGF.    This private information was transmitted alongside a Client ID ("cid"), which is a unique identifier Google uses to distinguish the specific individual from all other individuals.

**Figure 1**

| Request URL: | https://www.google-analytics.com/j/collect?v=1&_v=j101&a=52120583&t=pageview&_s=1&dl=https%3A%2F%2Fwww.shadygrovefertility.com%2Fappointment%2F&ul=en-us&de=UTF-8&dt=Schedule%20an%20Appointment%20%7C%20Shady%20Grove%20Fertility&sd=24-bit&sr=400x755&vp=400x755&je=0&_u=QACAAAABAAAAAC~&jid=&gjid=&cid=1199068694.1720797707&tid=UA-8246995-1&_gid=1446865008.1722270335&_slc=1&gtm=45He47o0n71TZD38Rv71659430za200&gcd=13l3l3l3l1&dma=0&tag_exp=95250752&z=2129999728 |
| --- | --- |

56.     As shown in Figure 2, as a result of SGF's decision to incorporate Microsoft's UET tag on the appointment scheduling page, SGF likewise disclosed to Microsoft that an individual was requesting an appointment, including what specific type of appointment was requested (e.g., intrauterine insemination).  This private information was transmitted alongside a "vid" which is a unique identifier Microsoft uses to distinguish the specific individual from all other individuals.

**Figure 2**

| Request URL: | https://bat.bing.com/action/0?ti=5039585&tm=gtm002&Ver=2&mid=e0f7eaae-359f-47bd-b178-040acfcec560&sid=f5950f604dc611efb79e2b6a5961d461&vid=c3427b3042df11ef8c3515ad0641cb52&vids=0&msclkid=N&uach=pv%3D10.0.0&pi=918639831&lg=en-US&sw=1536&sh=864&sc=24&tl=Schedule%20an%20Appointment%20%7C%20Shady%20Grove%20Fertility&p=https%3A%2F%2Fwww.shadygrovefertility.com%2Fappointment%2F&r=https%3A%2F%2Fwww.shadygrovefertility.com%2Ftreatments%2Fintrauterine-insemination-iui%2F&lt=583&mtp=10&evt=pageLoad&sv=1&cdb=AQAQ&rn=805085 |
| --- | --- |

57.     SGF disclosed similar information to Meta.  As shown in Figure 3, because SGF incorporated the Meta Pixel on the appointment scheduling page, SGF disclosed to Meta that the individual was seeking an appointment with SGF. This private information was transmitted alongside a "fbp" which is a unique identifier associated with the individual seeking the appointment.

**Figure 3**

| Request URL: | https://www.facebook.com/tr/?id=1681287545442424&ev=Lead&dl=https%3A%2F%2Fwww.shadygrovefertility.com&rl=https%3A%2F%2Fwww.shadygrovefertility.com&if=false&ts=1722270941828&sw=1536&sh=864&v=2.9.162&r=stable&ec=1&o=4124&fbp=fb.1.1721071428953.81462342144771659&pm=1&hrl=1e44f4&ler=other&cdl=API_unavailable&it=1722270941809&coo=false&cs_cc=1&ccs=176188462904822%2C389961121358449&cas=5477980325545888&rqm=GET |
| --- | --- |
| Request Method: | GET |

58.     Once an individual submits their information on the SGF appointment scheduling page, Google and Microsoft received confirmation that an appointment was requested.   For example, Google received confirmation that the user had reached the "thank you" page and that the previously visited page was the appointment scheduling page.  Another transmission to Google specifically included the event "schedule_appointment_form_submit" once the appointment form was completed.  These transmissions were also submitted alongside the Client ID.

**D.     Plaintiffs and Class Members Do Not Consent to Defendant's Conduct**

59.     Plaintiffs and Class members had no way of knowing that SGF was disclosing their private communications, including PHI, when they interacted with the SGF Webpages because SGF inconspicuously incorporated the tracking technology into its website's code.

60.     This conduct is all the more egregious given the nature of the information shared on the SGF Webpages.  Seeking fertility treatment, including scheduling appointments, searching for fertility provider locations, finding specific fertility doctors, and otherwise contacting a fertility treatment provider, is inherently private information that should not be disclosed without consent.

61.      Indeed, this private information falls within SGF's definition of PHI.  SGF defines "Protected Health Information" and "PHI" to mean all "information, including demographic information, that may identify you and that relates to your past, present or future physical or mental health or condition and related health care services." The information SGF disclosed, for instance, identifying data alongside Plaintiffs' and Class members' requests for appointments, falls within this definition. As do the other communications SGF disclosed from the SGF Webpages.  SGF pledged that it would "[m]aintain the confidentiality" of this information and that it would not be "use[d] or disclose[d]" without the user's "written authorization" unless expressly stated.  SGF did not state or disclose that it would disclose this information to third parties or that those third parties would be permitted to use the data for their own benefit.

62.     Accordingly, Plaintiffs and Class members did not consent to SGF's conduct.

**E.      Plaintiffs and Class Members have a Reasonable Expectation of Privacy in their User Data**

63.     Plaintiffs and Class members have a reasonable expectation of privacy in their private communications on the SGF Webpages, including their PHI.

64.     Privacy polls and studies uniformly show that the overwhelming majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' personal data.

65.     For example, a study by *Consumer Reports* shows that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and about the same percentage believe internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them.[13]   Moreover, according to a study by *Pew Research Center*, a majority of Americans, approximately 79%, are concerned about how data collected about them by companies is used by companies.[14]

66.     Users act consistent with these preferences.  Following a new rollout of the iPhone operating software—which asks users for clear, affirmative consent before allowing companies to track users—85% of worldwide users and 94% of U.S. users chose not to share data with third parties when prompted.[15]

67.     Another recent study by DataGrail revealed that 67% of people were willing to pay $100 or more annually to keep their information out of the hands of companies and the

---

[13]     *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, CONSUMER REPORTS (May 11, 2017), https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907/?srsltid=AfmBOooZKcKElpRb-k9bvaOyAs93buRiD7f-WN1mFLMcULcWrE2TgAGb.

[14]     Brook Auxier, Lee Rainie, et. al., *Americans and Privacy: Concerned, Confused and Feeling Lack of Control Over Their Personal Information*, PEW RESEARCH CENTER (Nov. 15, 2019), https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-confused-and-feeling-lack-of-control-over-their-personal-information/.

[15]     Michael Grothaus, *Apple's newst ad perfectly visualizes how App Tracking Transparency stops companies from stalking you*, FAST COMPANY (May 20, 2021), https://www.fastcompany.com/90638821/apples-newest-ad-perfectly-visualizes-how-its-app-tracking-transparency-privacy-feature-stops-companies-from-stalking-you?partner=feedburner&utm_source=feedburner&utm_medium=feed&utm_campaign=Feed%3A+fastcompany%2Fheadlines+%28Fast+Company%29/.

government.  The same study revealed that 75% of people would abandon brands that do not take care of their data.[16]

68.     Privacy law experts have expressed concerns about the disclosure to third parties of a users' intimate health data.  For example, Dena Mendelsohn—the former Senior Counsel at Consumer Reports on privacy and technology policy—explained that having your personal health information disseminated in ways you are unaware of could have serious repercussions, including affecting your ability to obtain life insurance and how much you pay for that coverage, increase the rate you're charged on loans, and leave you vulnerable to workplace discrimination.[17]

69.     This data is also extremely valuable.  According to Experian, health data is a "gold mine" for healthcare companies and clinicians.[18]

70.     Consumers' health data is extremely profitable.  Companies like Pfizer, spend $12 million annually to purchase health data and the medical data industry itself was valued at over $2.6 billion back in 2014.[19]

71.     SGF's disclosure of Plaintiffs' and Class members' private communications, including PHI, violates Plaintiffs' and Class members' privacy interests.

### TOLLING, CONCEALMENT, AND ESTOPPEL

72.     The applicable statutes of limitation have been tolled as a result of SGF's knowing and active concealment and denial of the facts alleged herein.

73.     SGF secretly incorporated analytics and advertising tracking technology on the SGF Webpages, providing no indication to users that they were interacting with sites that shared their data, including their PHI, with third parties.

---

[16]     *New DataGrail Research, The Great Privacy Awakening, Underscores How Far People are Willing to Go to Protect Their Personal Information in Absence of Federal Regulations*, DATAGRAIL, (Oct. 27, 2022), https://www.datagrail.io/press/new-datagrail-research-the-great-privacy-awakening/.
[17]     Donna Rosato, *What Your Period Tracker App Knows About You*, CONSUMER REPORTS (January 28, 2020), https://www.consumerreports.org/health/health-privacy/what-your-period-tracker-app-knows-about-you-a8701683935/?srsltid=AfmBOorUUdG5IkbJcnIsmAbZSoRMWZC6nJmg8bkddX7GrxxgMwuyRpri.
[18]     Experian Health, *Healthcare data: the value of historical patient data*, EXPERIAN (June 16, 2022), Healthcare data: the value of historical patient data - Healthcare Blog (experian.com).
[19]     Adam Tanner, *How Data Brokers Make Money Off Your Medical Records*, SCIENTIFIC AMERICAN (February 1, 2016), https://www.scientificamerican.com/article/how-data-brokers-make-money-off-your-medical-records/.

74.     SGF had exclusive knowledge that the SGF Webpages incorporated analytics and advertising tracking technology, yet failed to disclose that fact to users, or that by interacting with the SGF Webpages Plaintiffs' and Class members' private communications, including PHI, would be disclosed to and intercepted by third parties.

75.     Plaintiffs and Class members could not with due diligence have discovered the full scope of SGF's conduct, including because it is highly technical and there were no disclosures or other indication that would inform a reasonable SGF user that SGF was disclosing their private communications to third parties, including Google, Meta, and Microsoft.

76.     The earliest Plaintiffs and Class members could have known about SGF's conduct was shortly before the filing of this Complaint.

77.     SGF was under a duty to disclose the nature and significance of their data sharing practices but did not do so.  SGF is therefore estopped from relying on any statute of limitations under the discovery rule.

78.     Additionally, SGF engaged in fraudulent conduct to prevent Plaintiffs and Class members from discovering the disclosure of their data to third parties, including Google, Meta, and Microsoft.  SGF misled Plaintiffs and Class members to believe their private communications, including PHI, would not be disclosed to any third parties through their representations described herein.

79.     Plaintiffs and Class members were not aware that SGF disclosed their private communications, including their PHI.

80.     Plaintiffs and Class members exercised due diligence to uncover the facts alleged herein and did not have actual or constructive knowledge of SGF's misconduct by virtue of their fraudulent concealment.

81.     Accordingly, all statutes of limitations are tolled under the doctrine of fraudulent concealment.

## CLASS ACTION ALLEGATIONS

82.     Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23 individually and on behalf of the following Class:

> **Nationwide Class:** All natural persons in the United States and its territories who used the SGF Webpages and whose communications on these SGF Webpages were shared with third parties, including Google, Meta, and Microsoft.

83.     Excluded from the Class are: (1) any Judge or Magistrate presiding over this action and any members of their immediate families; (2) the Defendant, Defendant's subsidiaries, affiliates, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and their current or former employees, officers, and directors; and (3) Plaintiffs' counsel and Defendant's counsel.

84.     **Numerosity:** The exact number of members of the Class is unknown and unavailable to Plaintiffs at this time, but individual joinder in this case is impracticable.  The Class likely consists of hundreds of thousands of individuals, and the members can be identified through SGF's records.

85.     **Predominant Common Questions:** The Class claims present common questions of law and fact, and those questions predominate over any questions that may affect individual Class members.  Common questions for the Class include, but are not limited to, the following:

- Whether Defendant intentionally installed third party analytics and advertising tracking technology on the SGF Webpages;

- Whether Defendant knew that the third party analytics and advertising tracking technology it installed on the SGF Webpages would result in the disclosure of Plaintiffs' and Class members' private communications, including PHI;

- Whether Defendant violated Plaintiffs' and Class members' privacy rights;

- Whether Defendant violated the Maryland Wiretapping and Electronic Surveillance Act;

- Whether Defendant was unjustly enriched;

- Whether Plaintiffs and the Class members are entitled to equitable relief, including but not limited to, injunctive relief, restitution, and disgorgement; and

- Whether Plaintiffs and the Class members are entitled to actual, statutory, punitive or other forms of damages, and other monetary relief.

86.    **Typicality:** Plaintiffs' claims are typical of the claims of the other members of the Class.  The claims of Plaintiffs and the members of the Class arise from the same conduct by Defendant and are based on the same legal theories.

87.    **Adequate Representation:** Plaintiffs have and will continue to fairly and adequately represent and protect the interests of the Class.  Plaintiffs have retained counsel competent and experienced in complex litigation and class actions, including litigations to remedy privacy violations.  Plaintiffs have no interest that is antagonistic to the interests of the Class, and Defendant has no defenses unique to any Plaintiffs.  Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and they have the resources to do so.  Neither Plaintiffs nor their counsel have any interest adverse to the interests of the other members of the Class.

88.    **Substantial Benefits:** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable.  This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.  Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

89.    Plaintiffs reserve the right to revise the foregoing class allegations and definitions based on facts learned and legal developments following additional investigation, discovery, or otherwise.

## MARYLAND LAW APPLIES TO THE NATIONWIDE CLASS

90.     Maryland substantive laws apply to every member of the Nationwide Class. Maryland's substantive laws may be constitutionally applied to Plaintiffs' and Class members' claims under the Due Process Clause, 14th Amend. §1, and the Full Faith and Credit Clause, Art. IV. §1 of the U.S. Constitution.  Maryland has significant contact, or significant aggregation of contacts, to the claims asserted by Plaintiffs and Class members, thereby creating state interests to ensure that the choice of Maryland state law is not arbitrary or unfair.

91.     SGF is a Maryland corporation with its principal place of business in this State. SGF conducts substantial business in Maryland, such that Maryland has an interest in regulating SGF's conduct under its laws.  SGF also selected Maryland law as the law to govern all disputes with its users in its Terms of Use and Privacy Policy, which expressly states "any dispute relating to privacy . . . will be resolved according to the laws of the State of Maryland, without regard to conflict of law rules."[20] SGF's decision to reside in Maryland and avail themselves of Maryland's laws renders the application of Maryland law to the claims herein constitutionally permissible.

92.     The application of Maryland laws to the Nationwide Class is also appropriate under Maryland's choice of law rules because Maryland has a substantial relationship to Plaintiffs' and Class members' claims, and Maryland has a greater interest in applying its laws than any other interested state here given a significant amount of SGF's conduct at issue occurred in this State.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Violation of Common Law Invasion of Privacy – Intrusion Upon Seclusion**
**(On Behalf of Plaintiffs and the Class)**

93.     Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

94.     Under Maryland law, intrusion upon seclusion occurs when (1) the defendant intentionally intrudes upon the plaintiff's solitude, seclusion, private affairs, or concerns; (2) in

---

[20]     *Privacy Policy*, *supra* note 11.

which an individual has a reasonable expectation of privacy; and (3) in a manner that would be highly offensive to a reasonable person.

95.     Plaintiffs and Class members have an objectively reasonable expectation of privacy, solitude, and seclusion in their private communications on SGF Webpages, including their PHI.  Plaintiffs and Class members reasonably expected that such information would remain private.

96.     SGF intentionally intruded upon Plaintiffs' and Class members' solitude, seclusion, and private affairs or concerns when it disclosed Plaintiffs' and Class members' private communications, including PHI, to third parties through the third party analytics and advertising tracking technology it incorporated on the SGF Webpages.

97.     Plaintiffs and Class members did not consent to or authorize, nor were they aware of SGF's disclosure of their private communications to third parties, including Google, Meta, and Microsoft, through the third party advertising and analytics tracking technology that SGF deployed on the SGF Webpages.

98.     SGF's intentional disclosure of Plaintiffs' and Class members' private communications, including PHI, to third parties is highly offensive to a reasonable person. Reasonable people would expect their communications with a fertility provider to remain private and find the unauthorized disclosure of those communications to be highly offensive given the nature of the information conveyed.  This is especially true given SGF's express promise to maintain the confidentiality of Plaintiffs' and Class members' PHI, as well as other federal and state laws protecting the privacy of such information.

99.     Plaintiffs and Class members have suffered harm and injury as a direct and proximate result of SGF's invasion of their privacy.  Further, by disclosing Plaintiffs' and Class members private communications to third parties, including Google, Meta, and Microsoft, SGF took Plaintiffs' and Class members' valuable information and derived benefit therefrom without Plaintiffs' or Class members' knowledge or consent and without sharing the benefit of such value.

100. Plaintiffs and Class members seek appropriate relief for that injury, including, but not limited to injunctive and declaratory relief, general and actual damages, and punitive damages that will reasonably compensate Plaintiffs and Class members for the harm to their privacy interests as well as a disgorgement of profits earned as a result of its intrusion upon Plaintiffs' and Class members' solitude, seclusion, and private affairs or concerns.

101. Plaintiffs also seek such other relief as the Court may deem just and proper.

**SECOND CLAIM FOR RELIEF**
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Class)**

102. Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

103. Unjust enrichment is established where (1) a party confers a benefit upon another; (2) the benefitting party knows or appreciates the benefits; and (3) the benefitting party's acceptance or retention of the benefit under the circumstances is such that it would be inequitable to allow them to retain the benefit without the paying of value in return.

104. Plaintiffs and Class members conferred a benefit on SGF in the form of valuable, private communications SGF collected from Plaintiffs and Class members. SGF collected, used, and disclosed this information to third parties, including Google, Meta, and Microsoft for its own gain, including for advertising, analytics, and marketing purposes.

105. SGF knew or appreciated the benefits of such information that it intentionally collected and disclosed to third parties, including Google, Meta, and Microsoft, by virtue of its unauthorized disclosure and use of this data and the valuable analytics, insights, and advertisements generated from it.

106. Plaintiffs and Class members would not have provided their valuable private communications, including PHI, to SGF if they had known SGF was disclosing it to third parties, including Google, Meta, and Microsoft, and using it for its own gain.

107.    SGF unjustly retained these benefits at the expense of Plaintiffs and Class members. SGF did not provide any commensurate compensation to Plaintiffs and Class members in exchange for its disclosure of their private communications for its own gain.

108.    The benefits that SGF derived from Plaintiffs' and Class members' private communications rightfully belong to Plaintiffs and Class members.  It would be inequitable under unjust enrichment principles for SGF to be permitted to retain any of the profit or other benefits they derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

109.    SGF should be compelled to disgorge in a common fund for the benefit of Plaintiffs and Class members all unlawful or inequitable proceeds that SGF received, and such other relief as the Court may deem just and proper.

**THIRD CLAIM FOR RELIEF**
**Violation of Maryland Consumer Protection Act**
**MD. COMM. LAW CODE ANN., §13-101, *et seq.***
**(On Behalf of Plaintiffs and the Class)**

110.    Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

111.    The Maryland Consumer Protection Act ("MCPA") provides that a person may not engage in any unfair and deceptive trade practice in the sale, lease rental, loan, or bailment, or offer for sale, lease, rental, loan, or bailment of any consumer services, including, "failure to state a material fact if the failure deceives or tends to deceive," and "[d]eception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with . . . the promotion or sale of any . . . consumer service," Md. Code Ann., Com. Law §13-301, regardless of whether the consumer Is actually deceived or damaged, Md. Code Ann., Com. Law §13-302. SGF engaged in unfair and deceptive practices that violated the MCPA as described above.

112.    Plaintiffs and Class members, and Defendant SGF are all "[p]erson[s]" within the meaning of the Maryland Consumer Protection Act, Md. Code Ann., Com. Law §13-101(h).

113.    SGF offered and promoted consumer services by its offering of the SGF Website, which allows users to schedule an appointment, contact SGF, find a fertility provider, and find an SGF location.

114.    SGF participated in and engaged in deceptive business or trade practices prohibited by the MCPA by failing to state and knowingly concealing, suppressing, and omitting the material fact that SGF was disclosing Plaintiffs' and Class members' private communications to third parties.

115.    That SGF incorporated third party analytics and advertising tracking technology on the SGF Webpages and disclosed Plaintiffs' and Class members' private communications through that technology was a material fact because of consumers' expectations that this type of information would remain private.

116.    SGF knowingly and intentionally concealed, suppressed, and omitted material facts in connection with its disclosure of Plaintiffs' and Class members' private communications by, among other things, failing to disclose that it intentionally incorporated third party analytics and advertising tracking technology on the SGF Webpages through which it disclosed Plaintiffs' and Class members' private communications to third parties.  SGF omitted such material facts with the intent that Plaintiffs and Class members rely on the same in using the SGF Webpages.

117.    SGF at all times knew that the third party analytics and advertising tracking technology would disclose Plaintiffs' and Class members' private communications, including PHI, from the SGF Webpages to third parties, including Google, Meta, and Microsoft.

118.    SGF knew or should have known that its conduct violated the MCPA.

119.    Plaintiffs and Class members reasonably relied on SGF to protect and safeguard their private communications, including PHI, and to promptly and adequately inform them of the unauthorized disclosure of same.

120.    Plaintiffs and Class members had no way of discerning SGF's concealment, suppression, and omission of these material facts when they used the SGF Webpages because Plaintiffs and Class members did not have access to SGF's exclusive and superior knowledge

about the SGF Webpage's design and incorporation of third party analytics and advertising tracking technology.

121.   Plaintiffs and Class members reasonably relied on SGF's concealment, suppression, and omissions of material facts because they would not have used the SGF Webpages to communicate with SGF, and provided their PHI to SGF had they known that SGF was disclosing this information to third parties, including Google, Meta, and Microsoft, through the analytics and advertising tracking technology that SGF intentionally installed on the SGF Webpages.

122.   Plaintiffs and Class members would not have used or paid money for SGF's medical services, or would have paid less for those services had SGF not concealed, suppressed, and omitted its disclosure of Plaintiffs' and Class members' private communications, including PHI, from the SGF Webpages to third parties, including Google, Meta, and Microsoft.  Therefore, as a proximate and direct result of SGF's unfair and deceptive trade practices, Plaintiffs and Class members were harmed and suffered ascertainable loss including, among other things, overpayment for SGF's services and/or improper taking of their valuable data.

123.   As a direct and proximate result of SGF's unfair or deceptive acts or practices, Plaintiffs and Class members suffered and will continue to suffer injury in fact and/or actual damages.

124.   SGF's violations present a continuing risk to Plaintiffs and Class members as well as to the general public.  SGF's unlawful acts and practices complained of herein affect the public interest.

125.   Pursuant to Md.  Code Ann., Com.  Law §13-408, Plaintiffs and Class members seek monetary relief against SGF in the amount of actual damages, attorneys' fees, and any other just and proper relief available under the MCPA

**FOURTH CLAIM FOR RELIEF**
**Violation of Maryland Wiretapping and Electronic Surveillance Act**
**Md.  Code Ann., Cts. & Jud.  Proc. § 10-401, *et seq.***
**(On Behalf of Plaintiffs and Class Members)**

126.     Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

127.     The Maryland Wiretapping and Electronic Surveillance Act ("Maryland Wiretap Act"), Md.  Code Ann., Cts. & Jud.  Proc. §10-401, *et seq.*, provides that it is unlawful for any person to "[w]illfully intercept, endeavor to intercept, or procure any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication," or "[w]illfully use, or endeavor to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subtitle." Md.  Code Ann., Cts. & Jud.  Proc. §10-402(a)(1), (3).

128.     Maryland Wiretap Act confers a civil cause of action on "[a]ny person whose wire, oral, or electronic communication is intercepted, disclosed, or used in violation of this subtitle . . . against any person who intercepts, discloses, or uses, or procures any other person to intercept, disclose, or use the communications." Md.  Code Ann., Cts. & Jud.  Proc. §10-410(a).

129.     "Intercept" means "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." Md.  Code Ann., Cts. & Jud.  Proc. §10-401(10).

130.     "Electronic communication" means "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system." Md.  Code Ann., Cts. & Jud.  Proc. §10-401(5)(i).

131.     "Contents" includes "any information concerning the identity of the parties to the communication or the existence, substance, purport, or meaning of that communication." Md. Code Ann., Cts. & Jud.  Proc. §10-401(4).

132.    An "electronic communication service" means "any service that provides to users of the service the ability to send or receive wire or electronic communications." Md. Code Ann., Cts. & Jud. Proc. §10-401(6).

133.    Plaintiffs and Class members and SGF all qualify as "[p]erson[s]" within the meaning of the Maryland Wiretap Act.

134.    Plaintiffs' and Class members' private communications with SGF through the SGF Webpages are electronic communications under the Maryland Wiretap Act.

135.    SGF deploys third party tracking technology on the SGF Webpages, through which it procures the third parties to intercept Plaintiffs' and Class members' private communications, which included their PHI. By doing so, SGF procures these third parties to acquire the communications, i.e., intercept them.

136.    After procuring the third parties to acquire the content of Plaintiffs' and Class members' communications, SGF used the contents of the intercepted communications for their own advertising, analytics, and marketing purposes.

137.    Plaintiffs and Class members did not authorize the SGF's interception (through the third parties SGF procured to do such interception), redirection, disclosure, and/or use of their private electronic communications, including their PHI, on the SGF Webpages.

138.    The interception of Plaintiffs' and Class members' private communications was without authorization and consent from Plaintiffs and Class members, and thus lacked the prior consent of all parties to the communication. *See* Md. Code Ann., Cts. & Jud. Proc. §10-402(c)(3).

139.    Under the Maryland Wiretap Act, persons whose communications are intercepted in violation of the act "shall . . . be entitled to recover from any person: (1) Actual damages but not less than liquidated damages computed at the rate of $100 a day for each day of violation or $1,000, whichever is higher; (2) Punitive damages; and (3) A reasonable attorney's fee and other litigation costs reasonably incurred."

140.    Plaintiffs and Class members were damaged by SGF's conduct in that their privacy interests were harmed by the disclosure of their personally identifiable health information that they

intended to remain confidential.  SGF's conduct also harmed Plaintiffs and Class members by its use of their valuable personally identifiable health information without Plaintiffs' or Class members' consent for its own benefit and without sharing the benefit of such value.

## JURY TRIAL DEMAND

Pursuant to Fed.  R.  Civ.  P. 38(b), a jury trial is demanded on all claims so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs on behalf of themselves and the proposed Class respectfully request that the Court enter an order:

A.    Certifying the Class and appointing Plaintiffs as the Class representatives;

B.    Finding that SGF's conduct was unlawful, as alleged herein;

C.    Awarding such injunctive and other equitable relief as the Court deems just and proper;

D.    Awarding Plaintiffs and Class members statutory, actual, compensatory, consequential, punitive, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained;

E.    Awarding Plaintiffs and Class members pre-judgment and post-judgment interest;

F.    Awarding Plaintiffs and Class members reasonable attorneys' fees, costs, and expenses; and

G.    Granting such other relief as the Court deems just and proper.

Dated: August 14, 2024

/s/*Joseph Pettigrew*

Joseph Pettigrew, *Of Counsel*
(MD Bar No. 1812120130)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 W.  Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 233-4565
jpettigrew@scott-scott.com

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
Joseph P.  Guglielmo (*pro hac vice* forthcoming)
Anjori Mitra (*pro hac vice* forthcoming)
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 223-6444
jguglielmo@scott-scott.com
amitra@scott-scott.com

**LOWEY DANNENBERG, P.C.**
Christian Levis (*pro hac vice* forthcoming)
Amanda Fiorilla (*pro hac vice* forthcoming)
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: (914) 997-0500
Facsimile: (914) 997-0035
clevis@lowey.com
afiorilla@lowey.com